UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JOMO WILLIAMS,                                    :

                            Petitioner,           :

         -against-                                :

COMMISSIONER NYS DOC, et al.,                     :

                            Respondents.          :

--------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  10/31/2011
```

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
WILLIAM H. PAULEY, III**

07 Civ. 5496 (WHP) (FM)
07 Civ. 5514 (WHP) (FM)

**FRANK MAAS**, United States Magistrate Judge.

Petitioner Jomo Williams ("Williams") has filed two pro se petitions for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his convictions on burglary-related charges following two separate jury trials in Westchester County Court in 2003.  Williams received sentences in both cases which, in the aggregate, amount to a prison term of five and one-half to eleven years.  He was paroled in October 2010, but remains subject to post-release supervision until June 2014.

The petitions, together with more than 300 pages of supporting papers, set forth a laundry list of alleged constitutional violations for which Williams seeks relief.[1] For the reasons set forth below, both petitions should be denied.  In addition, pursuant to

---

[1]     Williams has attached a lengthy set of papers to each petition.  The two sets of papers are virtually identical, although the order in which the pages appear varies slightly.  For the sake of clarity, I have numbered the pages attached to both petitions.  Cites to "Pet. Attach." refer to the pages attached to the petition in the 07 Civ. 5496 proceeding.

28 U.S.C. § 2253(c)(2), Williams should be denied a certificate of appealability because he has failed to make the necessary showing of the denial of a constitutional right.

I.    Factual Background

A.    CompUSA Case

The petition in 07 Civ. 5496 challenges Williams' conviction on charges of Burglary in the Third Degree and Criminal Mischief in the Third Degree following a jury trial in June 2003 before Justice Mary H. Smith.  These charges arose out of Williams' involvement in a break-in at a CompUSA store in White Plains, New York.

1.    Trial

The evidence at trial, viewed in the light most favorable to the People, established as follows:

a.    Offense Conduct

On July 25, 2002, at approximately 3 a.m., Lieutenant James Hanlon ("Lt. Hanlon") of the White Plains Police Department responded to a radio report regarding a burglar alarm activated at a CompUSA store.  (T. 444-47).[2]  After additional units were dispatched, Lt. Hanlon and other officers began to establish a perimeter around the building.  (Id. at 447).  Lt. Hanlon then heard a fire alarm, and turned toward the noise in

---

[2]    "T. _" refers to the transcript of the CompUSA trial.  "PDH. _" refers to the transcripts of post-disposition hearings in the CompUSA case.  "Ex. _" refers to the exhibits appended to the Respondents' memorandum of law in the CompUSA proceeding.  "T2. _" refers to the transcript of the Staples trial.  "H2. _" refers to the transcript of the pretrial hearings in the Staples case.  "S. _" refers to the transcript of Williams' sentencing hearing in the Staples case. "Ex2. _" refers to the exhibits attached to the Respondents' memorandum of law in the Staples case.

time to see Williams fleeing the building.  (Id. at 449).  He and another officer chased Williams through a parking lot into a wooded area near the Bronx River Parkway, where they eventually found him "hiding underneath [a] bush."  (Id. at 451, 454).

After apprehending Williams, the police examined the CompUSA facility.  (Id. at 549).  On the roof, they saw a hatch that appeared to have been pried open.  (Id. at 525-26, 555-56).  A ladder extended from the hatch down to a janitor's closet, in which the police found two flashlights.  (Id. at 555, 557-58, 644-45).  Inside the back door of CompUSA, the police found two pry bars and a sledge hammer.  (Id. at 547, 559).  They also recovered two sets of gloves in the parking lot.  (Id. at 561).

###### b.  Search of Williams' Vehicle

After Williams was handcuffed, Officer Keith Collins retrieved a set of keys from him during a "quick pat down."  (Id. at 524, 527-28).  The keys had a clear plastic tag with a license plate number that corresponded to the license plate of a green Mercury Mountaineer ("Mountaineer") subsequently located in a nearby parking lot.  (Id. at 592-94, 616-17).

The Mountaineer later was searched pursuant to a search warrant.  (Id. at 590, 615-16).  Inside, the police found, among other items:  (i) a pair of shorts containing a rental agreement for a U-Haul box truck and paperwork belonging to Williams' friend, DeVaughn Holmes ("Holmes");[3] (ii) rental paperwork for the Mountaineer in the name of

---

[3]     Holmes is variously identified in the trial transcripts as "Davonn Holmes" and "DeVaughn Holmes."  Holmes also was arrested and charged in connection with the break-in at

(continued...)

Williams' brother, Jamal Williams; (iii) a "crumpled" sheet of paper listing several computer items; (iv) a power tool used for cutting metal and wood; (v) a cutting grinder; (vi) a black nylon gym bag containing various hand tools, cutting wheels, a hacksaw, and a hatchet; (vii) a black plastic bag containing a flashlight; and (viii) several documents bearing Williams' name, including insurance cards and a mortgage application.  (Id. at 616-18, 624, 627-30, 637-39, 641-42, 644-45; PDH. 38; T2. 772).  Williams' fingerprint also was recovered from inside the car.  (T. 647-48).

Additionally, in a nearby parking lot, the police found three U-Haul vehicles (two trucks and a van) with the keys still inside.  (Id. at 596-600).  The van contained three bolt cutters and an electric screwdriver.  (Id. at 601).  One of the trucks contained a grinder, a green bag with various hand tools, a battery pack, a wrench, a drill bit, and an electric drill.  (Id. at 602-04).

c.    Courtroom Break-In

During the trial, someone attempted to break into the courtroom where Williams was being tried.  (See id. at 688-89).  An article in a local newspaper describing the incident "made a connection to [Williams], saying that Mr. Williams is being tried for burglary in [Justice] Smith's Court."[4]  (Id. at 689).  Accordingly, on June 11, 2003, when

---

[3](...continued)
CompUSA.  (See id. at 856-57).

[4]    The relevant portion of the article reads:  "Officials said they did not know why Smith's courtroom was targeted.  The judge is presiding over the trial of Jomo Williams, who is accused of breaking into a CompUSA store in White Plains."  Jonathan Bandler, Police Probe
(continued...)

the jurors entered the courtroom, Justice Smith told them that it had been "brought to [her] attention that the Gannett Papers had run an article; a newspaper article, about this case and certain circumstances that . . . are not involved in this case." (Id. at 692)  All of the jurors answered in the negative after the Justice asked if anyone had seen the article. (Id.).  One juror indicated, however, that he had heard about the article.  (Id.).

After clearing the courtroom, Justice Smith questioned that juror in the presence of Williams and both counsel.  (Id. at 693).  The juror explained that someone at work had approached him the previous day and had "mentioned that they had heard something about a break-in, in the courtroom, and . . . thought it was related to a case involving Comp U.S.A." (Id. at 693-94).  The co-worker asked the juror if he was on that case, to which he had responded, "I couldn't say." (Id. at 694).  Justice Smith instructed the juror that the article had absolutely no bearing on the case and asked whether he could still be fair and objective.  (Id. at 694-95).  The juror responded that there was "nothing in the one sentence that was told to me that [indicated] it had [] anything to do with anybody in the room." (Id. at 695).  Based on that response, the court denied the application of Williams' counsel to disqualify the juror.  (Id. at 695-96).

---

[4](...continued)
Attempt to Break Into Courtroom, The Journal News (Westchester, N.Y.), June 10, 2003, at 4B.

d.     Prosecutor's Summation

Although Williams did not put on a case, his theory of defense was that he

simply was in the wrong place at the wrong time.  (See id. at 435-36).  In response, the

prosecutor noted in his summation that there was "no evidence that anyone else

committed this crime."  (Id. at 840).  The prosecutor argued further that Williams'

counsel, Richard Willstatter, Esq. ("Mr. Willstatter"), was trying to "confuse" the jury

through the use of "smoke screens," as part of a "desperate attempt . . . to say that

someone else committed this crime."  (Id. at 847-48).  Mr. Willstatter objected to these

statements, but Justice Smith overruled his objections.  (Id.).

At the end of the prosecutor's summation, Mr. Willstatter moved for a

mistrial, accusing the prosecutor of launching "abominable [personal] attacks on [him]."

(Id. at 853-54).  Justice Smith denied the application, observing that "it was a rather mild

summation by the prosecution."  (Id. at 855).

e.     Jury Instruction and Verdict

On June 12, 2003, Justice Smith charged the jury.  (Id. at 853).  Over Mr.

Willstatter's objection, the Justice gave the following instruction with respect to Holmes:

> In this case there was an item allegedly belonging to one
> Davonn Holmes, admitted into evidence.  To wit:  A pair of
> shorts, which contained a rental receipt that was found in the
> green Mercury Mountaineer.
>
> Davonn Holmes has been charged with regard to this incident
> at bar, but he is not on trial here.  You should not speculate as
> to the status of his case, or whether he in fact was involved in
> this alleged burglary.

6

> I give this instruction just to explain why his name was
> mentioned in regard to evidence that was admitted.  Whatever
> alleged participation Mr. Holmes had in this incident has no
> relevance to the guilt or non guilt of Mr. Jomo Williams.

(Id. at 856-57, 883).

On June 13, 2003, the jury returned a verdict of guilty on both charges in

the indictment:  Burglary in the Third Degree and Criminal Mischief in the Third Degree.

(Id. at 929).

2.    Sentencing

On November 25, 2003, Williams appeared before Judge Kenneth H. Lange

for a hearing to determine "whether or not Mr. Williams [could] be sentenced as a

predicate felon."[5]  (PDH. 1-2).  At that hearing, Williams appeared pro se.[6]  (Id.).  The

People offered evidence of four of Williams' prior convictions, each of which was a Class

---

[5]    Justice Smith recused herself on October 14, 2003, after learning that Williams
had filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules seeking
a writ of mandamus against her and other respondents.  (See letter to the Court from Asst. Dist.
Att'y Mark A. Garretto, dated Jan. 15, 2010 (attach.); Ex. H-1 at 2-29; see also Ex. H-1 at 2-17).
In that petition, Williams alleged that the respondents "abused their discretion, went beyond their
authority, [and] fail[ed] to perform a duty or prevent a wrong" in regard to his trial.  (Ex. H-1 at
2-17).  The Appellate Division, Second Department, denied Williams' petition and dismissed the
proceeding on February 23, 2004, stating that "[t]he extraordinary remedy of mandamus will
lie . . . only when there exists a clear legal right to the relief sought.  The petitioner has failed to
demonstrate a clear legal right to the relief sought."  Williams v. Smith, 771 N.Y.S.2d 717, 717
(2d Dep't 2004) (internal citation omitted).

[6]    On August 13, 2003, Justice Smith granted Mr. Willstatter's  request to withdraw
as Williams' counsel after Williams accused him of rendering ineffective assistance.   (See Exs.
F-1, H-1 at 2-29, 2-34).

E felony: (a) Attempted Criminal Mischief in the Second Degree (Queens County, June 3, 1992); (b) Bail Jumping in the Second Degree (Queens County, Mar. 16, 1995); (c) Attempted Criminal Possession of a Weapon in the Third Degree (Queens County, Mar. 16, 1995); and (d) Grand Larceny in the Fourth Degree (Rockland County, Feb. 21, 1995). (Id. at 22, 24-26, 28).[7]  Williams had received a sentence of five years' probation on the Attempted Criminal Mischief charge and prison sentences of eighteen months to three years on each of the other charges. (Id.).  The People argued that it was permissible to sentence Williams as a predicate felony offender on the basis of his three convictions in 1995, and noted that Williams had been sentenced as a predicate offender in 1995 because of his 1992 conviction. (Id. at 30-31).

Williams countered that "the fact that it has on the minutes that I had allowed to be sentenced as a predicate offender [in 1995] doesn't . . . bind [me] to it for the simple reason that it would be ineffective counsel that didn't contest the prior convictions." (Id. at 31).  Williams then testified under oath about the 1995 convictions as follows:

> I had an incident with an agreement with the government . . . .
> I was instructed that the plea — I was pleading to a
> nonviolent felony Subdivision 3 of [the New York Criminal
> Procedure Law ("CPL")], I think it's, 265.02 . . . which was

---

[7] Williams was convicted of the Bail Jumping and Criminal Possession charges under the alias "Kashem Spencer." (PDH. 20, 24-26).

going to make me eligible for shock[8] and was going to set me up as a nonviolent felon.

By doing this I was told that also all the other pending matters I had at the time, which was Rockland County and other pending matters, indictments during 1995 will all be placed in one package, and I'm pleading to all of it at one time.

Prior to that plea bargain . . . I had intentions to, wholeheartedly, to dispute them and take them to trial and maintain my innocence. However, I was informed that it would be more convenient and more rapid if I just resolved the matter with the plea bargain. . . . The judge said he will make a recommendation for shock. That I was entering into Subdivision 3 not 4, which you see this very day is still on my papers.[9]

(Id. at 36-38).

Williams also alleged that his version of the events would be supported by

the minutes of the plea colloquy, which his brother could provide to the court. (Id. at 38).

He testified that if he had been told he would be classified as a violent felon, and thus

---

[8]    Williams was referring to the Shock Incarceration program, a "boot camp prison" for young adults in which they are subject to "shorter incarceration than the youthful offenders would normally receive, but the regimen involves strict, military-style discipline, unquestioning obedience to orders, and highly structured days filled with drill and hard work." See National Institute of Justice, Shock Incarceration in New York (August 1994), available at http://www.ncjrs.gov/pdffiles/shockny.pdf (last visited Oct. 11, 2011); see also N.Y. Correct. Law § 865).

[9]    New York Penal Law § 265.02(3) provides, in pertinent part:  "A person is guilty of criminal possession of a weapon in the third degree when . . . [s]uch person knowingly possesses a machine-gun, firearm, rifle or shotgun which has been defaced."  Possession of a defaced weapon is a non-violent felony.  See People v. Johnson, 875 N.Y.S.2d 724, 724 (4th Dep't 2009).  In 2006, the New York Legislature repealed subsection (4), which related to the crime of possession of a loaded firearm and was a violent felony.  See N.Y. Penal Law § 265.02(4) (repealed 2006); People v. Heath, 86 N.Y.2d 723, 724 (1995).

ineligible for shock incarceration, he "would have halted the proceedings right there and exercised [his] right to go to trial." (Id. at 44).  After hearing this testimony, Judge Lange adjourned the hearing to afford Williams a chance to produce the minutes of the 1995 plea.  (Id. at 72-73).

The hearing continued on November 26, 2003.  (Id. at 75).  At the outset, Williams challenged his 1992 conviction for Attempted Criminal Mischief in the Second Degree on the basis that he believed at the time that he was pleading guilty to a misdemeanor, not a felony.  (Id. at 77-79).  As evidence of this misunderstanding, Williams introduced a copy of a page from a criminal law treatise, which described the crime of Criminal Mischief in the Second Degree as a Class E felony, the attempt of which would be a Class A misdemeanor.  (Id. at 78); see also N.Y. Penal Law § 110.05(7) ("An attempt to commit a crime is a . . . Class A misdemeanor when the crime attempted is a class E felony.").  He also suggested that Judge Finnegan, who sentenced Williams in 1995, had indicated that Williams' 1992 conviction was for a misdemeanor.  (Id. at 79).

Judge Lange determined, however, that each of Williams' prior convictions could serve as the basis for sentencing him as a predicate felony offender.  (Id. at 85-86).  With respect to the 1992 conviction, Judge Lange pointed out that Judge Finnegan specifically had asked Williams if he understood that he was "again pleading guilty to a felony," and that Williams had responded affirmatively.  (Id. at 84-85) (emphasis added).  Judge Lange also found that the transcript of the 1995 plea allocution did not support Williams' contention that "there was a binding promise on the Court and the prosecutor

10

that he should receive shock incarceration."  (Id. at 84).  With respect to the shock

program, Judge Finnegan merely had stated:  "I don't know if you are qualified, but I'll

recommend it."  (Id.).  Judge Lange also noted that Williams admitted that he had

criminally possessed a loaded, rather than a defaced, weapon, and that, if convicted of

another crime in the future, he could receive a longer sentence based on his guilty plea.

(Id. at 83-85).  Judge Lange concluded that "there is no merit in the credible evidence to

the claims by [Williams] that his prior felony convictions were . . . constitutionally

impaired."  (Id. at 85).

　　　　After denying Williams' request to adjourn his sentencing in order to bring

in character witnesses, Judge Lange sentenced him to a term of three and one-half to

seven years on the burglary charge and two to four years on the criminal mischief charge,

with both sentences to run concurrently.  (Id. at 99-100, 107).

　　B.　　Staples Case

　　　　Williams' second habeas petition (07 Civ. 5514) challenges his conviction

on charges of Attempted Burglary in the Third Degree, Criminal Mischief in the Third

Degree, and Possession of Burglar's Tools, following a jury trial before Judge Lange in

January 2004.  This case arose out of an attempted break-in at a Staples store in Yonkers,

New York.

　　　　1.　　Offense Conduct

　　　　The evidence at this trial, viewed in the light most favorable to the People,

established as follows:

11

On November 5, 2002, just after 2 a.m., the Yonkers Police Department received a "911" call reporting loud noises coming from a Staples store in a shopping center located at 1703 Central Park Avenue in Yonkers.  (T2. 541, 550-51).  Police Officer Nicholas Lalli ("Officer Lalli") was the first to arrive at the scene.  (Id. at 500, 507).  Because he was not assigned to work that night in the sector where Staples was located, Officer Lalli waited for the "primary unit" to arrive.  (Id. at 506-08).  As he waited, he saw a "black male, tall, [in] dark colored clothing" exit the woods behind the shopping center, "walk down alongside the guardrail and then enter a vehicle" parked along the road.  (Id. at 509).  The vehicle was a red Ford Taurus.  (Id. at 671).

Once his sector officer, Richard Hurley ("Officer Hurley"), arrived, Officer Lalli made his way to the Ford Taurus.  (Id. at 508, 511).  Upon reaching the vehicle, he saw that the passenger had "reclined the seat all the way back" so that only the top of his head was visible.  (Id. at 512).  Officer Lalli proceeded to talk to the man, who was later identified as Michael Elie ("Elie"), for approximately five minutes before arresting him and securing him in his radio car.  (Id. at 511-14).

Police Officer Jason Richards ("Officer Richards") and his partner, Police Officer Ronald Romano ("Officer Romano") also responded to the scene.  (Id. at 637).  Upon arriving at Staples, they observed Officer Lalli standing outside of his radio car with Elie.  (Id. at 638).  Officer Lalli informed them that he had observed Elie emerge from a wooded area.  (Id. at 639).  Thinking that the loud noises reported in the "911" call may have been the result of someone attempting to break into a car, Officer Richards

began checking vehicles parked nearby.  (Id.).  After walking past four or five vehicles, the officer noticed an open red bag on the ground between two cars.  (Id.).  He picked up the bag, brought it back to his squad car, and examined its contents, which included "a heavy duty grinder, spare grinding wheels and some other loose tools."  (Id. at 640).

Officer Richards then returned to the area where he found the bag, which was near where Elie had exited the woods.  Shining his flashlight into the woods, he observed "two males huddled in the fetal position with another black bag within arms length of one of the males."  (Id. at 641).  Both men had a fine white powder on their boots, hands, and legs which appeared to be some sort of masonry dust.  (Id. at 645).  Williams, who was "on release after posting bail" in the CompUSA case, was the man closer to the black bag; his companion was Holmes.  (Id. at 643; see Aff. in Opp'n to Pet., sworn to on July 15, 2009, at 3).  At that point, Officer Richards called for Officer Romano to assist him in arresting Williams and Holmes.  (T2. 644).

After securing both defendants, Officer Richards retrieved the black bag, which contained screwdrivers, drill bits, and two flashlights.  (Id.).  He and Officer Hurley then returned to Staples and went to the rear of the building, where Officer Hurley had been prior to the arrest.  (Id. at 544-50).  Officer Hurley earlier had observed that some fencing at the top of a staircase in the rear of the building was cut.  (Id. at 545-46).  Upon his return, he noticed that, in addition to the fencing at the top of the stairs, a section of fence that enclosed the roof had also been cut.  (Id. at 551).  Further, there was a "lantern type flashlight" on the ledge, with the light powered on.  (Id.).  The officers

13

called the fire department so that they could get a ladder and examine the roof.  (Id. at 552).

Once on the roof, Officer Hurley observed "a two foot by two foot section of wall that . . . appeared to have been struck numerous times with an object causing the cinderblock to break."  (Id. at 553).  There also were two bolt cutters on the roof, and several air conditioning vents had been opened.  (Id.).  Debra Delano, the general manager of the Staples store, later joined Officer Richards on the roof.  She testified at trial that she had been on the roof a few days prior to November 5, 2002, and had not seen any of the damage now visible, including the cut wires and open air conditioning vents.  (Id. at 625-27).

While Officers Hurley and Richards were on the roof, Officer Romano recovered a black, two-way hand-held radio from Holmes, whom he had searched while Officer Richards searched Williams.  (Id. at 668-69).  After removing the radio, he attempted to "key" it to see if another radio was on the same frequency.  (Id. at 669-70).  Through this process he determined "that another radio set to the same channel frequency was with Mike Elie in one of the [police] cars."  (Id. at 670).

2.   _Sandoval_ Hearing

On December 9, 2003, prior to the start of trial, Judge Lange held a hearing pursuant to People v. Sandoval, 34 N.Y.2d 371 (1974), to address the admissibility of Williams' prior convictions since Williams indicated that he planned to testify in order to establish a defense of duress.  The People sought permission to cross examine Williams

about his 1992 Attempted Criminal Mischief conviction, his three 1995 convictions for

Bail Jumping, Attempted Criminal Possession of a Weapon, and Grand Larceny, his

recent conviction in the CompUSA case, and two convictions for Burglary and Attempted

Burglary in New Jersey in 1992 and 1993.  (H2. 217-219, 221).  The People also sought

to inquire into Williams' use of the alias "Kashem Spencer."  (Id. at 219-20).

   Williams' counsel, Michael White, Esq. ("Mr. White"), objected to the

People cross examining Williams on "any convictions labeled either as burglary or

attempt to commit burglary or conspiracy to commit burglary," or with respect to the

facts underlying the criminal mischief convictions.  (Id. at 224-25).  Mr. White contended

that the prosecutor's goal was to portray Williams as a career burglar who, because he

had committed burglaries in the past, was likely also to have committed the one now

charged.  (Id. at 222-24).  Mr. White also objected to any use of Williams' recent

conviction in the CompUSA case because Williams intended to appeal.  (Id. at 227-29).

   Judge Lange ruled that the People could not question Williams about the

facts underlying the CompUSA case because the time to appeal had yet to expire, but

could establish that Williams was convicted of a felony.  (Id. at 231-32; 246).  Judge

Lange further held that the People could ask Williams about the specific charges of which

he was convicted in 1992 and 1995, but not the underlying facts.  (Id. at 232-35).  The

judge also allowed the People to inquire about Williams' use of the name "Kashem

Spencer" in prior proceedings.  (Id. at 236).  Judge Lange excluded all evidence of the

New Jersey convictions, however, reasoning that the conduct underlying the charges was

15

too remote in time to have probative value with respect to the issue of Williams'
credibility sufficient to overcome their prejudicial effect.  (Id.).

Both sides reargued the Sandoval issues on December 11, 2003.  Williams
again raised his argument that his 1995 convictions were obtained unconstitutionally
because, at the time he entered his plea, he believed that he was pleading guilty to a non-
violent weapons charge, which would preserve his eligibility for the shock incarceration
program.  (Id. at 350-51).  Mr. White also emphasized the highly damaging effect that
evidence of the prior convictions would have on Williams' duress defense.  (Id. at 356-
58).  For their part, the People requested that Judge Lange reconsider his ruling with
respect to Williams' conviction in the CompUSA case.  (Id. at 358-59).  Judge Lange
altered his earlier ruling only as to Williams' conviction for weapons possession,
allowing the People to ask him whether he had been convicted of a felony in Queens
County in 1995.  (Id. at 361).

On January 20, 2004, just prior to the beginning of trial, the People again
asked Judge Lange to modify his Sandoval ruling, this time asking for permission to cross
examine Williams about all of his previous burglary-related convictions, in light of
Williams' intent to raise duress as a defense.  (T2. 445-46, 716-20).  Judge Lange elected
not to issue a binding ruling at that time, but put the parties "on notice" of a Second
Department case, People v. Stranton, 685 N.Y.S.2d 250 (2d Dep't 1999), that specifically
permitted "the prosecutor to cross-examine the defendant regarding the underlying facts
of his prior convictions . . . in light of the defendant's testimony that [he] participated in

16

the crime under duress."  (T2. 449).  Judge Lange added that "testimony that [Williams] was compelled to commit this burglary under duress would probably open the door to the Court's modifying its <u>Sandoval</u> ruling to permit testimony of the underlying facts of the earlier burglary."  (<u>Id.</u> at 450).

The following day, Judge Lange confirmed that the People could cross-examine Williams as to the underlying facts of his burglary-related convictions because his duress defense made his propensity to commit burglaries relevant.  (<u>Id.</u> at 720).  Williams subsequently testified at his trial and was cross-examined about his criminal history.  (<u>Id.</u> at 767-96).

### 3.   Verdict and Sentencing

On January 27, 2004, the jury returned a verdict of guilty on all three counts of the indictment:  Attempted Burglary in the Third Degree, Criminal Mischief in the Third Degree, and Possession of Burglar's Tools.  (<u>Id.</u> at 942).

Judge Lange sentenced Williams on March 4, 2004.  (S. 1, 13-15).  Although Williams again challenged his status as a predicate felon on the grounds that the 1995 convictions were unconstitutionally obtained, he acknowledged that Judge Lange previously had found him to be a predicate felon, and that this finding was binding on him in the Staples case.  (<u>Id.</u> at 4-5).  Relying on the doctrine of collateral estoppel, Judge Lange once again found that Williams was a predicate felony offender.  (<u>Id.</u> at 5-6).

Judge Lange sentenced Williams to indeterminate terms of two to four years on the Attempted Burglary charge, two to four years on the Criminal Mischief

charge, and one year on the Possession of Burglar's Tools charge, with the sentences to be served concurrently, but consecutive to the sentences in the CompUSA case.  As a consequence of his convictions in both cases, Williams thus faced an aggregate sentence of five and one-half to eleven years in prison.  (Id. at 13-15).

II.   Subsequent Procedural History

     A.   Direct Appeals

     Williams appealed his convictions in both cases to the Appellate Division, Second Department.  His appellate counsel was Michael G. Paul, Esq. ("Mr. Paul").

          1.   Request to File Pro Se Supplemental Brief

     On August 4, 2005, Williams requested permission to file a consolidated pro se supplemental brief addressing the issues in both cases.  (Ex. L-1).  On September 30, 2005, the Appellate Division granted Williams leave to file two supplemental briefs (one for each appeal) and ordered that he be furnished with a copy of the transcripts of the proceedings below.  (Ex. M-1 at 1).  On October 6 and 7, 2005, the Appellate Division's Pro Se Clerk's office sent the transcripts of the proceedings in both cases to the Bare Hill Correctional Facility, where Williams was lodged.  (Ex. M-2; Ex2. M-2).  In the letters accompanying these materials, the Pro Se Clerk's office made clear that Williams had to serve and file nine copies of his briefs by January 3, 2006.  (Id.).

     In November and December 2005, Williams filed two motions with the Appellate Division.  The first motion alleged that the materials he had received from the Pro Se Clerk's office were "incorrect, incomplete, [contained] misquotes, extractions,

ommissions [sic]; and thus [did] not provide him with an accurate account of the full record of the lower proceedings . . . to make an effective brief." (Ex. N-1). Consequently, he asked that the "entire record" be provided to him. (Id.). He also requested that new counsel be assigned because Mr. Paul apparently had refused to apply for bail on Williams' behalf. (Id.).

In the second motion, Williams renewed his request to be assigned new counsel, and further moved to consolidate his two appeals. (Id.). By order dated May 23, 2006, the Appellate Division (a) denied the request to appoint new counsel; (b) granted the request to consolidate the appeals, but only to the extent that they could be argued or submitted on the same day; (c) ordered that certain additional transcripts be provided; and (d) extended the deadline by which Williams could serve and file nine copies of his briefs to July 28, 2006. See People v. Williams, Nos. 2004-02076, 2004-02951, 2006 N.Y. Slip Op. 69149(U) (2d Dep't May 23, 2006), available at http://www.nycourts.gov/reporter/ motions/2006/2006_69149.htm (last visited Oct. 11, 2011).

On July 31, 2006, the Pro Se Clerk's Office returned Williams' supplemental brief because he had filed only one copy of one brief, which did not include a table of contents or an affidavit of service on the District Attorney. (Ex. O-1).[10]  On September 8, 2006, Williams filed a motion to enlarge the time to file his supplemental brief. (See Ex. P-1). On September 28, 2006, the Appellate Division denied Williams'

---

[10]     A copy of Williams' supplemental pro se brief is included as Exhibit O-2, but is almost totally illegible.

request and vacated its earlier order granting Williams permission to file a supplemental

pro se brief because Williams "ha[d] failed to file a [supplemental] brief although afforded

sufficient opportunity to do so."  (Ex. Q-1).  Williams' motion to reargue subsequently

was denied by the Appellate Division on December 27, 2006.  (Ex. R-3).

On October 15 and 29, and November 12 and 19, 2006, Williams sent letters

to the New York Court of Appeals seeking leave to appeal the Appellate Division's

decision prohibiting him from filing his pro se supplemental brief.  (See Pet. Attach. at

103-27).  In these letters, Williams made numerous allegations concerning the purported

ineffectiveness of his appellate counsel, and he further asserted that misconduct by prison

officials and the Appellate Division's failure to supply him with relevant documents had

derailed his efforts to file his supplemental brief.  (Id. at 103-20).  In his October 15, 2006

letter, he also enumerated the "underlying issue[s] from the trials themselves":

> (i) Denied Right to be Present, (ii) Denied Rights to Counsel
> (choice; conflict free) (iii) Denied witnesses (out of 25, zero
> call[ed]) (iv) Double Jeopardy (v) change of venue (vi) invalid,
> unconstitutionally obtained and Pardon[ed] convictions were
> used against me (vii) improper instruction to juror (viii)
> Pattern of evidence destruction/[spoliation] by state (ix)
> improper summation by state (x) Excessive use of restraints in
> front of jurors (xi) refusal to excuse juror who [was informed
> of] newspaper article naming [Williams] in connection with
> break in . . . Et. Al issues of trial defects.

(Id. at 113-14).  In the letter dated November 19, 2006, Williams added claims that he was

"[d]enied trial preparation . . . [d]enied exculpatory evidence [specifically, a] co-

defendant['s] prestatement . . . [and that his] speed[y] appeal & apply-bail on appeal [claims were] denied . . . [and] much more."  (Id. at 124).

On December 11, 2006, the New York Court of Appeals denied leave to appeal the Appellate Division's decision barring Williams from filing a supplemental brief.  People v. Williams, 7 N.Y.3d 930 (2006).

### 2.   Appellate Division Decisions

Through his counsel, Williams raised five points on appeal with respect to the CompUSA trial, three of which are relevant to this habeas corpus proceeding.  Those claims allege that (a) he was deprived of his right to a fair trial because the prosecutor engaged in misconduct during his summation, (b) the jury instruction with respect to Holmes was prejudicial and deprived him of a fair trial,[11] and (c) Williams' sentence was constitutionally excessive because Judge Lange erred in finding that Williams was a predicate felony offender.[12]  (See Ex. J at i).

---

[11]     Although the brief states that "the trial court issued two instructions that unfairly . . . prejudiced defendant's case," (Ex. J at 24), the brief discusses only the instruction as to Holmes.

[12]     As discussed more fully below, Williams never presented the other claims raised in his CompUSA brief to the New York Court of Appeals, thereby rendering these claims procedurally defaulted and beyond the Court's purview.  See Section III.B, infra.

The two relevant grounds on which Williams appealed his conviction in the Staples case were that (a) Williams was denied his right to a fair trial by Judge Lange's erroneous <u>Sandoval</u> ruling, and (b) his sentence was excessive.[13]  (<u>See</u> Exs2. S, T-2 at 3).

On March 6, 2007, a panel of the Appellate Division, Second Department, unanimously affirmed Williams' conviction in both cases in two separate decisions. <u>People v. Williams</u>, 833 N.Y.S.2d 516 (2d Dep't 2007); <u>People v. Williams</u>, 833 N.Y.S.2d 515 (2d Dep't 2007).  With respect to the CompUSA case, the court found that the People had "sustained their burden of proving, beyond a reasonable doubt, that the defendant previously was convicted of a felony" and, therefore, that his adjudication as a second felony offender was proper and his sentence was not excessive.  <u>Williams</u>, 833 N.Y.S.2d at 518.  The court also noted that the "contention raised in Point I" of the brief — that Williams was denied his right to a fair trial through, <u>inter alia</u>, Justice Smith's refusal to declare a mistrial on grounds of prosecutorial misconduct — did "not require reversal." <u>Id.</u>  Finally, the court found Williams' jury instruction claim "unpreserved for appellate review."  <u>Id.</u>

With respect to the Staples case, the Appellate Division upheld Judge Lange's decision to permit cross examination regarding the facts underlying Williams' prior convictions, reasoning that, "[s]ince the defendant raised and adduced evidence

---

[13]    The Court does not have a copy of Williams' brief challenging his convictions in the Staples case because Exhibit J to the Respondents' memorandum in the 07 Civ. 5514 case is a duplicate of the brief attached as Exhibit J in the 07 Civ. 5496 case.  However, the Appellate Division's decision and the People's letter in opposition to Williams' application for leave to appeal identify the claims that Williams raised on appeal.  (<u>See</u> Exs2. S, T-2 at 3).

supporting the affirmative defense of duress, which undermined his criminal intent to commit the crimes charged, the People were properly permitted to rebut the defense with evidence of the defendant's criminal disposition or inconsistent intent." Williams, 833 N.Y.S.2d at 516. The court also reaffirmed its holdings in the CompUSA case that Judge Lange properly found Williams to be a predicate felony offender and that his sentence was not excessive. Id.

        3.     Appeal to the New York Court of Appeals

On April 13, 2007, Williams sent a letter to the New York Court of Appeals seeking leave to appeal. (Pet. Attach. at 135-39). In his letter, Williams stated that he sought leave to appeal "from final orders from the same two criminal appeals numbers . . . that were rendered on 3/16/07 . . . for the same reasons that are already in this court['s] files and submitted by me on 10/17/06, 10/29/06 & 11/12/06."[14] (Id. at 136).

Although Williams' application initially was incomplete because he failed to include copies of his appellate briefs, (see Ex. T-1), a letter from Williams to the Court of Appeals dated July 14, 2007, confirms that the court itself later requested (and presumably received) the briefs. (Pet. Attach. at 133). The July 14th letter also reiterated a number of the claims that Williams sought to assert. (Id.). Specifically, Williams wrote that he was raising grounds of "ineffective appellate counsel; denial of speedy appeal; denial of transcripts; Rosario and other discoveries for appeal; denial to make bail application;

---

[14]     The record does not contain any letter submitted by Williams on October 17, 2006. Williams was most likely referring to his letter dated October 15, 2006.

denial to consider pro se supplemental brief; prison official misconducts and abuses denied

my appellate rights by interfering with same rights; et. al. grounds (see all my papers

presently before this court)."  (Id.).

       The Court of Appeals denied Williams' application for leave to appeal both

Appellate Division decisions on August 24, 2007.  People v. Williams, 9 N.Y.3d 883

(2007).

      B.    Habeas Petitions

       On February 20, 2007, Williams filed a habeas corpus petition pursuant to

28 U.S.C. § 2254 alleging "appellate delay."  See Williams v. Comm'r NYSDOC, 07 Civ.

5496 (ECF No. 2).  On June 11, 2007, then-Chief Judge Kimba Wood dismissed that

petition without prejudice as moot because the Appellate Division had decided his appeal

on March 6, 2007.  (ECF No. 3).  Judge Wood also advised Williams that he would need

to exhaust his state court remedies before refiling his petition.  (Id.).

       On August 20, 2007, Williams filed a motion for reconsideration.  (ECF No.

5).  Although Williams had not yet exhausted his state remedies, the New York Court of

Appeals denied his application for leave to appeal four days later.  (ECF No. 6).  Judge

Wood therefore vacated her earlier order on December 21, 2007, and again informed

Williams that he would need to exhaust any constitutional grounds not raised in his direct

appeal.  Id.  Williams then filed the petitions presently before the Court on September 18, 2008.[15]

III.    Discussion

A.    Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d) (emphasis added).

---

[15]    Although the December 21st order stated that Williams' action would be dismissed if he did not file his amended petition within sixty days, the Respondents do not contend that his petitions are untimely.

As the Second Circuit noted in Jones v. Stinson, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" 229 F.3d 112, 119 (2d Cir. 2000). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. This standard does not require that reasonable jurists would all agree that the state court was wrong. Id. at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" Stinson, 229 F.3d at 119 (quoting Francis S. v. Stone, 221 F.3d 100, 109 (2d Cir. 2000)).

Additionally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389. It also bears mention that when a petitioner is proceeding pro se, as Williams is here, the Court is obligated to read his petition and supporting papers "liberally, and . . . interpret

26

them to raise the strongest arguments that they suggest."  Burgos v. Hopkins, 14 F.3d 787,

790 (2d Cir. 1994); see also Williams v. Kullman, 722 F.2d 1048, 1050 (2d Cir. 1983)

(courts should review pro se habeas petitions "with a lenient eye").

      B.     Procedural Default and Exhaustion

          1.     Applicable Law

      A federal habeas court is precluded from reviewing a petitioner's claim if the

state court's prior denial of it rested on an adequate and independent state ground.  See,

e.g., Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 81

(1971).  A petitioner's failure to comply with a state procedural rule qualifies as such an

adequate and independent state ground, provided that (a) the state court actually "relied on

the procedural bar as an independent basis for its disposition of the case," Harris, 489 U.S.

at 261-62 (internal quotation marks and citation omitted), and (b) the state procedural rule

is "firmly established and regularly followed."  See Cotto v. Herbert, 331 F.3d 217, 239-

40 (2d Cir. 2003) (internal quotation marks omitted).  A claim rejected under these

circumstances is considered "procedurally defaulted."  Coleman v. Thompson, 501 U.S.

722, 731 (1991).

      In determining whether to deny a habeas claim on the basis of a procedural

default, federal courts "apply a presumption against finding a state procedural bar and 'ask

not what we think the state court actually might have intended but whether the state court

plainly stated its intention.'"  Galarza v. Keane, 252 F.3d 630, 637 (2d Cir. 2001) (quoting

Stinson, 229 F.3d at 118).  When the last state court to issue a reasoned decision relies on

a state procedural bar, however, a court reviewing a habeas petition will presume that

subsequent decisions rejecting the claim without discussion relied on the bar and did not silently consider the merits. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). Furthermore, even if the state court proceeds to consider the merits of the claim, its reliance on a procedural ground as one basis for the denial of the claim precludes habeas review. Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); Velasquez v. Leonardo, 898 F.2d 7, 9 (2d Cir. 1990).

Federal review of a procedurally defaulted claim is prohibited unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman, 501 U.S. at 750; Glenn, 98 F.3d at 724. To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously. Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991). A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness. See Carrier, 477 U.S. at 494-95. Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." See Schlup v. Delo, 513 U.S. 298, 320 (1995); Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001).

In addition to the barriers posed by the procedural default doctrine, Williams may not obtain habeas review of his claims unless he has exhausted all available state court remedies, or that there is an absence of state corrective process, or circumstances

28

render that process ineffective to protect his rights.  See 28 U.S.C. § 2254(b)(1)(A)-(B).

As a defendant charged with crimes in New York State, Williams unquestionably had an

effective process available to him through the existing state statutes governing appeals and

collateral challenges in criminal cases.  See CPL §§ 440.10 (motion to vacate judgment),

440.20 (motion to set aside sentence), 450.10 (direct appeal to Appellate Division as of

right), 450.15 (discretionary appeal to Appellate Division from denial of motion to vacate

judgment), 450.90 (discretionary appeal to Court of Appeals from adverse Appellate

Division ruling).  Therefore, to satisfy the exhaustion requirement with respect to a

particular federal claim, Williams must show that he "fairly present[ed]" the claim "in

each appropriate state court (including a state supreme court with powers of discretionary

review)."  Baldwin v. Reese, 541 U.S. 27, 29-30 (2004).  In New York, those

"appropriate" state courts include both the Appellate Division and the Court of Appeals.

Galdamez v. Keane, 394 F.3d 68, 74 (2d Cir. 2005).

          "A federal constitutional claim has not been fairly presented to the State

courts unless the petitioner has informed those courts of 'all of the essential factual

allegations' and 'essentially the same legal doctrine he asserts in his federal petition.'"

Strogov v. Att'y Gen. of N.Y., 191 F.3d 188, 191 (2d Cir. 1999) (quoting Daye v. Att'y

Gen. of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982)).  To meet this requirement, it is not

necessary that the federal constitutional claim be presented to the state courts in haec

verba.  As the Second Circuit noted in Galdamez, "[t]he Supreme Court has warned

against interpreting [the exhaustion requirement] too narrowly, holding that it requires

'only that state prisoners give state courts a fair opportunity to act on their claims.'"  394

F.3d at 72 (quoting <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 844 (1999)) (emphasis in

<u>O'Sullivan</u>).  Thus, there are a number of ways in which a claim may be presented,

including:

> [1] reliance on pertinent federal cases employing constitutional
> analysis, [2] reliance on state cases employing constitutional
> analysis in like fact situations, [3] assertion of the claim in
> terms so particular as to call to mind a specific right protected
> by the Constitution, and [4] allegation of a pattern of facts that
> is well within the mainstream of constitutional litigation.

<u>Daye</u>, 696 F.2d at 194.  However, a petitioner who raises certain claims in his brief to the

Appellate Division does not fairly present those same claims to the Court of Appeals

merely by attaching a copy of the brief to his application for leave to appeal.  <u>See</u> <u>Jordan v.</u>

<u>Lefevre</u>, 206 F.3d 196, 199 (2d Cir. 2000) ("attaching an appellate brief without explicitly

alerting the [Court of Appeals] to each claim raised does not fairly present such claims for

purposes of the exhaustion requirement underlying federal habeas jurisdiction"); <u>Grey v.</u>

<u>Hoke</u>, 933 F.2d 117, 120 (2d Cir. 1991).  Furthermore, when a petitioner presses certain

claims in his application for leave to appeal, and either fails to mention or makes a cursory

reference to the other claims discussed in his brief to the Appellate Division, courts will

not consider those other claims to have been "fairly presented."  <u>See</u> <u>Jordan</u>, 206 F.3d at

199; <u>Grey</u>, 933 F.2d at 120.

   Additionally, a federal court may "deem" an otherwise unexhausted claim to

be exhausted if it would be procedurally barred in the state court to which the petitioner

would be required to present the claim.  <u>Coleman</u>, 501 U.S. at 735 n.1; <u>Aparicio</u>, 269 F.3d

at 90.  In that circumstance, although the petitioner technically will have satisfied the

exhaustion requirement, he also will have procedurally defaulted his claim, thus preventing the federal court from reaching the claim's merits, unless the petitioner can show either cause for the default and resulting prejudice, or actual innocence. See Sweet v. Bennett, 353 F.3d 135, 139 (2d Cir. 2003); Sams v. Donelli, No. 07 Civ. 4600 (DLC), 2008 WL 2939526, at *3 n.2 (S.D.N.Y. July 28, 2008).

When faced with an unexhausted claim, a federal habeas court may, in certain circumstances, order a stay to allow the petitioner to exhaust the claim in state court. See Rhines v. Weber, 544 U.S. 269, 277 (2005); Zarvela v. Artuz, 254 F.3d 374, 381-82 (2d Cir. 2001). "[S]tay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless." Rhines, 544 U.S. at 277. Federal courts thus have the power to deny unexhausted claims on their merits. 28 U.S.C. § 2254(b)(2).

2.     Application of Law to Facts

In his prolix submissions, Williams raises a laundry list of claims. Only the claims addressed in his appellate counsel's two briefs to the Appellate Division, however, possibly could meet Section 2254's exhaustion requirement. See Lurie v. Wittner, 228 F.3d 113, 124 (2d Cir. 2000) (claim not exhausted where petitioner presented the claim for the first time to the Court of Appeals and that court denied leave to appeal). The issue with respect to exhaustion therefore is whether Williams "fairly presented" any of these claims to the Court of Appeals. See Baldwin, 541 U.S. at 29-30.

31

As a preliminary matter, it is not clear whether the Court of Appeals ever received copies of Williams' two appellate briefs.  (See Pet. Attach. at 133 (stating only that the Court of Appeals had requested the briefs)).  Assuming, however, that the Court of Appeals did, in fact, receive copies of the briefs, their mere receipt is insufficient to exhaust all of the claims set forth therein.  See Jordan, 206 F.3d at 199; Grey, 933 F.2d at 120.  Accordingly, to determine whether Williams "fairly presented" to the Court of Appeals any of the claims raised in his appellate briefs, the Court must look to Williams' various letters seeking leave to appeal.

In his letter dated April 13, 2007, Williams expressly stated that he was requesting leave to appeal "for [the] same reasons that are already in this court['s] files and submitted by me on 10/17/06, 10/29/06 & 11/12/06."  (Pet. Attach. at 136).  Additionally, in his letter of July 14, 2007, Williams specifically identified certain claims that he wished to raise (none of which had been presented to the Appellate Division), followed by a general reference to the papers he previously had submitted to the Court of Appeals.  (Id. at 133 ("See all my papers presently before this court.")).  It follows that no claim asserted in his two appellate briefs may be considered exhausted unless Williams discussed the claim in one of his prior submissions to the Court of Appeals in such a manner as to give that court a "fair opportunity" to pass upon the claim.  See Galdamez, 394 F.3d at 72.

Williams' various letters appear to contain only three references to claims addressed in his appellate briefs.  Specifically, in cataloguing the "underlying issue[s] from the trials themselves" in his letter of October 15, 2006, Williams stated that "invalid,

32

unconstitutionally obtained and pardon[ed] convictions were used against [him,] . . . [that there was an] improper instruction to [the] juror[,] . . . [and] improper summation by [the] State." (Pet. Attach. at 113-14). By themselves, these statements are not enough to "apprise the [Court of Appeals] of both the factual and the legal premises of the federal claims ultimately asserted in the habeas petition." See Galdamez, 394 F.3d at 73.

However, reading these references with a "lenient eye," as the Court must, see Kullman, 722 F.2d at 1050, they arguably are sufficient to alert the Court of Appeals that Williams sought to raise certain claims that were presented to the Appellate Division in his two briefs. Williams' mention of the People's use of "unconstitutionally obtained and pardon[ed] convictions" alludes both to his claim that Judge Lange's Sandoval ruling deprived him of a fair trial in the Staples case, (see Ex2. S), and his claim that his sentences, which were enhanced as a result of these prior convictions, violated the Eighth Amendment. (See id.; Ex. J). In addition, the reference to the improper jury instruction relates to his claim that Justice Smith gave an unfair jury charge in the CompUSA case.[16] Finally, Williams' remark regarding "improper summation" likely refers to the prosecutor's summation in the CompUSA case.

In sum, construing Williams' letters to the New York Court of Appeals liberally, it appears that he has exhausted his claims that (a) his trial in the CompUSA case

---

[16]   Although Williams' reference to an "improper instruction to juror," (emphasis added), arguably could apply to Justice Smith's questioning of the CompUSA juror who had heard about the courtroom break-in, his mention of Justice Smith's refusal to excuse this juror a few lines later makes it likely that the first reference relates to the Justice's allegedly improper jury instruction. (See Pet. Attach. at 114).

was fundamentally unfair due to prosecutorial misconduct and a prejudicial jury charge,[17]
(b) Judge Lange's <u>Sandoval</u> ruling deprived him of a fair trial in the Staples case, and (c)
his sentences in both cases were excessive.

There are also claims that Williams could not have raised on direct appeal
because the factual basis for them was outside the record. Among these is Williams' claim
that his appellate counsel was constitutionally ineffective. These claims clearly are
unexhausted because Williams has neither filed a motion under CPL § 440.10 to vacate
the judgment, nor petitioned the Second Department for a writ of error <u>coram</u> <u>nobis</u>, which
are the only procedures available under New York law for challenging the effectiveness of
appellate counsel.[18] <u>Garcia v. Scully</u>, 907 F. Supp. 700, 706-07 (S.D.N.Y. 1995). The
Court need not grant a stay to allow Williams to exhaust these claims, however, because,
as set forth below, these claims are "plainly meritless." <u>See</u> <u>Rhines</u>, 544 U.S. at 277.

---

[17]     The Appellate Division found William's jury instruction claim "unpreserved for
appellate review." <u>Williams</u>, 833 N.Y.S.2d at 518. It appears from the trial transcript, however,
that Williams made a timely, specific objection, and that Justice Smith made "an express ruling"
with regard to that objection. (<u>See</u> T. 677-81, 910-11). For these reasons, it is not entirely clear
how the court arrived at its conclusion. <u>See</u> <u>Garvey v. Duncan</u>, 485 F.3d 709, 714 (2d Cir. 2007)
("Under New York statutory law, there are two distinct ways a question of law can be preserved
for appeal. The first is through an objection at trial by a party later claiming error. The second
is when the trial court makes an express ruling with regard to a particular question.") (citing CPL
§ 470.05(2)). Although a state court's reliance on a state procedural rule may not be considered
an "adequate" ground foreclosing federal review if the court's decision lacks a "fair or
substantial basis in state law," <u>El Rhagi v. Artuz</u>, 309 F.3d 103, 107 (2d Cir. 2002) (internal
quotation marks omitted), the Court need not address the issue of adequacy in this case because,
as discussed in Section III.D, <u>infra</u>, Williams' jury instruction claim is meritless.

[18]     Williams occasionally refers to the filing of a § 440.10 motion and a <u>coram</u> <u>nobis</u>
petition in his supporting papers, (<u>see, e.g.</u>, Pet. Attach. at 137), but there is no evidence that he
ever made any such filings. (<u>See</u> ECF No. 21 ("Resp't's Staples Mem.") at 48-50).

Finally, Williams has other claims that are record-based, but which were never raised before the Court of Appeals.  The Court must deem these claims exhausted, and thus procedurally defaulted, since New York law provides for only a single application for direct review to the Court of Appeals and prohibits collateral review of claims which could have been, but were not, raised on direct appeal.  See N.Y. Ct. Rules, § 500.11(a); CPL § 440.10(2)(c) (barring collateral review of claims for which "sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised").  The Court therefore is precluded from considering such claims unless Williams demonstrates cause for his failure to raise them on appeal and resulting prejudice.[19]

Williams offers three possible bases for his failure to raise these claims on direct appeal:  (a) the ineffective assistance of his appellate counsel; (b) numerous instances of misconduct on the part of prison officials that prevented him from timely submitting his pro se supplemental brief to the Appellate Division; and (c) the failure of officials and employees of the Appellate Division to provide him with transcripts and other documents that he needed to file his supplemental brief.  (See Pet. Attach. at 4, 7, 9, 74, 87-88, 103-115, 133).  Although ineffective assistance of counsel and "interference by state officials [that] made compliance with the procedural rule impracticable" may both give rise to cause, see Carrier, 477 U.S. at 488; Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994), neither ground saves Williams' claims in this case.

---

[19]     Williams wisely does not contend that he is actually innocent.

At the outset, Williams' allegations concerning the ineffective assistance of appellate counsel relate to a claim which is unexhausted and, therefore, may not be used as a justification for his failure to present his claims in state court. See Carrier, 477 U.S. at 489 ("if a petitioner could raise his ineffective assistance claim for the first time on federal habeas in order to show cause for a procedural default, the federal habeas court would find itself in the anomalous position of adjudicating an unexhausted constitutional claim for which state court review might still be available"). Furthermore, Williams is not entitled to a stay of his habeas corpus proceedings to return to state court to exhaust his ineffective assistance of appellate counsel claim because he has not shown "good cause" for his failure to present this claim in state court. See Rhines, 544 U.S. at 277 ("stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court"). Moreover, staying this action to allow Williams to exhaust this ineffective assistance claim would be a fool's errand because, as discussed more fully below, this claim is "plainly meritless."

Turning to Williams' allegations of interference by state officials with his efforts to file a supplemental brief, as this Court has previously concluded in the course of addressing the civil rights claims interspersed among Williams' habeas claims, Williams' allegations of misconduct by prison officials are, with a few exceptions, "entirely conclusory in nature." Williams v. Comm'r NYSDOC, Nos. 07 Civ. 5496 (WHP) (FM), 07 Civ. 5514 (WHP) (FM), 2010 WL 1047661, at *3 (S.D.N.Y. Mar. 2, 2010), report and rec. adopted, 2010 WL 1063327 (S.D.N.Y. Mar. 22, 2010). To the extent that Williams

36

seeks to rely on allegations of misconduct by Appellate Division personnel as a basis of

overcoming his failure to exhaust, his contentions are equally conclusory.  (See, e.g., Pet.

Attach. at 9, 87, 104-05).  The instances where Williams' allegations are not wholly

conclusory are not relevant to his efforts to file a supplemental brief.  Therefore, the

alleged interference by state officials is insufficient to demonstrate cause.  See Tineo v.

United States, 977 F. Supp. 245, 254 (S.D.N.Y. 1996) (defendant's "general and

conclusory allegations" that the condition of the prison library hindered the preparation of

his 2255 motion were "insufficient to support a finding of cause") (emphasis in original).

        In sum, because Williams has not demonstrated cause for his failure to

present to the New York state courts claims that could have been pursued there, the Court

is prohibited from considering these claims.

    C.    Exhausted Claims

        1.    Prosecutorial Misconduct

        In his brief to the Appellate Division, Williams argued that the prosecutor's

summation "was not a fair comment of the evidence [but] was instead a persistent personal

attack upon defendant's counsel."  (Ex. J at 12).  In particular, he contended that the

prosecutor's remarks that defense counsel was deliberately attempting to confuse the jury

and was using "smoke screens" implied that defense counsel was lying and, therefore,

caused him substantial prejudice.  (Id.).  Additionally, Williams complained that the

prosecutor failed to rely on evidence in the record when giving his summation.  (Id. at 12-

13).

To establish a due process violation based on prosecutorial misconduct, it is not enough that the prosecutor's conduct was improper; rather, a petitioner must show that the prosecutor's conduct was so "substantially prejudicial" that the petitioner was denied a fundamentally fair trial.  See Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990); Flores v. Keane, 211 F. Supp. 2d 426, 435 (S.D.N.Y. 2001).  The Second Circuit applies a three-factor test to determine whether the petitioner suffered "substantial prejudice," examining "the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper statements."  Floyd, 907 F.2d at 355 (internal quotation marks omitted).  Importantly, where the petitioner did not object to allegedly prejudicial remarks, "reversal is warranted only where the remarks amounted to a flagrant abuse."  United States v. Coriaty, 300 F.3d 244, 255 (2d Cir. 2002) (quotation marks omitted).

Here, the prosecutor's comments were far from being so inflammatory as to amount to constitutional error.  The Second Circuit reached the same conclusion in United States v. Millar, 79 F.3d 338, 343-44 (2d Cir. 1996), a case involving substantially similar prosecutorial remarks.  In Millar, the defendant accused the prosecutor of personally attacking defense counsel by referring to the defense case as "hog wash" and by stating that defense counsel had created a "smoke screen."  Id. at 343.  The prosecutor in Millar also urged members of the jury to ask themselves whether defense counsel was trying to "confuse" them or "lead them astray."  Id. at 344.  The Second Circuit found these remarks to be "mildly inappropriate, if that," stating that they "clearly [did] not rise to the

38

level of severity sufficient to require reversal." Id.  Thus, the Appellate Division correctly

determined that the prosecutor's comparable statements in the CompUSA trial "did not

require reversal." Williams, 833 N.Y.S.2d at 518.

    2.    Prejudicial Jury Instruction

When a habeas petitioner challenges the jury instructions given at his trial,

"the only question for [the court] is 'whether the ailing instruction by itself so infected the

entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502

U.S. 62, 72 (1991) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)); see also

Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) ("It must be established not merely

that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it

violated some [constitutional] right") (internal quotation marks omitted).

Williams' argument is that, by informing the jury that Holmes was charged

with a crime in connection with the CompUSA break-in, Justice Smith "in effect

instructed the jury to find [Williams] guilty by association." (See Ex. J at 26).  In fact,

Justice Smith did precisely the opposite.  She specifically instructed the jury not to

"speculate as to the status of [Holmes'] case, or whether he in fact was involved in this

alleged burglary." (T. 883).  The Justice also explained that she was giving the instruction

"just to explain why [Holmes'] name was mentioned in regard to evidence that was

admitted." (Id.).  Finally, the Justice added that "[w]hatever alleged participation Mr.

Holmes had in this incident ha[d] no relevance to the guilt or non guilt of Mr. Jomo

Williams." (Id.) (emphasis added).  Since the thrust of these instructions was to caution

the jury not to draw unwarranted inferences against Williams, it clearly cannot be said that this portion of her jury charge was so prejudicial as to deny Williams a fair trial.

### 3.   *Sandoval* Ruling

Williams challenges Judge Lange's <u>Sandoval</u> rulings in the Staples case on the grounds that they deprived him of the fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment.

The Supreme Court has yet to establish clearly "when the admission of prior crimes under state evidentiary laws can constitute a federal due process violation." <u>Allaway v. McGinnis</u>, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) (citing <u>Estelle</u>, 502 U.S. at 67-68). It follows that Judge Lange's decision to admit the evidence of prior convictions cannot be said to be "contrary to" or an "unreasonable application of" clearly-established federal law. <u>See</u> Williams, 529 U.S. at 412-13. Accordingly, Williams' claim that the <u>Sandoval</u> rulings in the Staples case were improper is meritless.

### 4.   Excessive Sentences

Williams contends that the sentences imposed in both cases were excessive, in violation of the Eighth Amendment's prohibition on cruel and unusual punishments, because they were based on an erroneous finding that he was a predicate felony offender. (<u>See</u> Pet. Attach. 65, 69, 87). He argues that he was undeserving of predicate offender status because (a) he was unaware when he pled guilty in 1992 that Attempted Criminal Mischief in the Second Degree was a felony, and (b) his 1995 guilty pleas were the product of "fraud, broken promises of shock referal [sic], and non-violent conviction." In

sum, he argues that each of his prior guilty pleas was not voluntary, knowing, and intelligent.  (Id. at 65).

A conviction obtained in violation of one's constitutional rights may not be used to enhance punishment for a later offense.  See Burgett v. Texas, 389 U.S. 109, 115 (1967).  In particular, due process requires that a guilty plea be entered "voluntarily, knowingly, and intelligently."  Bradshaw v. Stumpf, 545 U.S. 175, 183 (2005).  "A plea is 'intelligent' and 'voluntary' when a defendant had the advice of counsel, understood the consequences of his plea and the plea was not physically or mentally coerced."  Heron v. New York, No. 98 Civ. 7941 (SAS), 1999 WL 1125059, at *5 (S.D.N.Y. Dec. 8, 1999).  A federal court reviewing a state prisoner's habeas petition must defer to the determination of the state court as to the facts surrounding that plea.  Ayala v. New York, No. 03 Civ. 2762 (AKH), 2004 WL 527035, at *6 (S.D.N.Y. Mar. 16, 2004) (citing 28 U.S.C. § 2254(e)(1)).  Moreover, the statements made by a defendant during his guilty plea allocution "carry a strong presumption of verity . . . and are generally treated as conclusive in the face of the defendant's later attempt to contradict them."  Adames v. United States, 171 F.3d 728, 732 (2d Cir. 1999) (citations and internal quotation marks omitted).  The Constitution also "permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor."  United States v. Ruiz, 536 U.S. 622, 630 (2002).

Here, Judge Lange did not misapply established Supreme Court precedent. At his allocution before Judge Finnegan in 1995, Williams specifically admitted that he

41

attempted to possess a loaded, but not a defaced, weapon.  (S2. 83).  Furthermore, he

stated that he understood that if convicted of a crime in the future, he "may well serve

more jail time simply because" of the plea he was about to enter.  (Id. at 85).  Finally,

Judge Finnegan made clear that he could not guarantee that Williams would be admitted to

the shock treatment program, noting that he would merely make a recommendation and

did not know if Williams was qualified.  (Id. at 84).  Williams plea colloquy leaves little

room for doubt that Williams understood the nature of the offense to which he was

pleading guilty and the consequences of his plea.  Moreover, Williams cannot claim that

his plea was induced by the false promise of admission into the shock treatment program,

since no such promise was made on the record before the Court.

　　　　　Because Judge Lange did not err in finding that Williams was a predicate

felony offender, Williams' Eighth Amendment claim may readily be dismissed.  "There is

only a constitutional issue subject to habeas review when the sentence falls outside the

state statutory range."  Dotson v. Artus, No. 07 Civ. 5680 (GBD) (DFE), 2010 WL

3825731, at *2 (S.D.N.Y. Sept. 29, 2010) (citing White v. Keane, 969 F.2d 1381, 1383 (2d

Cir. 1992)).  In the CompUSA case, Judge Lange imposed concurrent sentences of three

and one-half to seven years on the third degree burglary count and two to four years on the

third degree criminal mischief count.  (PDH. 107).  In the Staples case, the Judge imposed

concurrent sentences of two to four years on the third degree attempted burglary and third

degree criminal mischief counts, and one year on the possession of burglar's tools count,

with the Staples sentences to run consecutive to the CompUSA sentences.  (S. 13-15).  In

42

the case of a predicate felony offender, the maximum sentence for third degree burglary (a class D felony) is four to seven years; for attempted third degree burglary and third degree criminal mischief (both class E felonies), three to four years; and for possession of burglar's tools (a class A misdemeanor), one year.  See N.Y. Penal Law §§ 110.05(6) (attempt to commit a class D felony), 140.20 (third degree burglary), 145.05 (third degree criminal mischief), 140.35 (possession of burglar's tools), 70.06(3)(d)-(e).  In addition, Penal Law § 70.25(2-a) mandated that the CompUSA and Staples sentences run consecutively.  Thus, Williams' sentence was within the ranges prescribed by state law.  It follows that Williams' sentence was not unconstitutional.

      D.    <u>Unexhausted Claims</u>

      1.    <u>Ineffective Assistance of Appellate Counsel</u>

Williams' first unexhausted claim is that his appellate counsel was constitutionally ineffective because he (a) did not raise every claim that Williams would have raised on appeal, but, instead, "argued weaker points;" (b) did not confer with Williams prior to filing his appellate briefs; (c) refused to make a bail application on Williams' behalf; (d) failed to rectify errors and omissions in the transcripts from the proceedings below; and (e) filed a motion in opposition to a motion filed by Williams. (See Pet. Attach. 9, 73-74, 87-88, 103-115, 133).

To prevail on his ineffectiveness claim, Williams must demonstrate (a) that his counsel's performance "fell below an objective standard of reasonableness" and (b) that there is a "reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 688, 694 (1984); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (applying Strickland to claims of ineffective assistance of appellate counsel).  In connection with the first of these requirements, Williams must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.  As the Second Circuit has noted, "[t]he Strickland standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard."  Lindstadt v. Keane, 239 F.3d 191, 199 (2d Cir. 2001). Williams does not come close to meeting either of Strickland's prongs.

     a.     Decision not to Raise Arguments and to Argue Weak Points

     In preparing a brief, appellate counsel is not required to raise every claim arising out of a trial and has the discretion to eliminate weaker ones.  Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Mayo, 13 F.3d at 533 ("[C]ounsel does not have a duty to advance every nonfrivolous argument that could be made.").  Thus, to satisfy the first prong of Strickland, Williams must show that his appellate counsel did something more than omit from his brief a nonfrivolous argument that Williams wished to pursue.  See Evitts v. Lucey, 469 U.S. 387, 394 (1985); Aparicio, 269 F.3d at 95.  He instead must establish that counsel opted not to raise "significant and obvious issues while pursuing issues that were clearly and significantly weaker."  Mayo, 13 F.3d at 533; Bragg v. Kuhlmann, No. 97 Civ. 3025 (SHS), 1998 WL 867245, at *3 (S.D.N.Y. Dec. 14, 1998).

Williams has utterly failed to make such a showing.  Mr. Paul's decision to press certain claims on appeal, while leaving others behind, therefore does not constitute ineffective assistance of counsel.

> b.    Alleged Failure to Confer with Williams

An appellate attorney's failure to consult with his client is not a per se violation of a defendant's Sixth Amendment rights.  See Buitrago v. Scully, 705 F. Supp. 952, 955 (S.D.N.Y. 1989).  "Although it may be desirable and productive, the Constitutional right to effective assistance of counsel does not encompass the requirement that an attorney consult with his client to discuss the alleged trial errors that his client wishes to pursue."  McIntyre v. Duncan, No. 03 Civ. 0523 (ADS), 2005 WL 3018698, at *3 (E.D.N.Y. Nov. 8, 2005).  Thus, a petitioner's "assertion that his appellate counsel failed to consult with [him] prior to filing the appellate brief, or incorporate in that appellate brief the arguments asserted by [him] in his pro se appellate brief, does not, without more, establish that [petitioner] received ineffective assistance."  Campbell v. Greene, 440 F. Supp. 2d 125, 152 (N.D.N.Y. 2006); see also Warren v. Napoli, No. 05 Civ. 8438 (CM) (KNF), 2009 WL 2447757, at *18 (S.D.N.Y. Aug, 10, 2009) (same). Here, Williams has failed to establish anything beyond a mere failure to consult and therefore is not entitled to habeas relief.

> c.    Counsel's Refusal to Apply for Bail

New York law provides that defendants like Williams, who have appealed their conviction and sentence to either the Appellate Division or the Court of Appeals,

may apply to be released on their own recognizance or on bail pending appeal.  CPL §§ 460.50 (appeal to Appellate Division), 460.60 (appeal to Court of Appeals).  Whether to grant bail to a defendant-appellant in the circumstances presented here, however, is a discretionary decision.  See CPL §§ 510.30(2)(b), 530.50.

Williams cites People v. Petrovich, 87 N.Y.2d 961 (1996), in support of his argument that appellate counsel was under an obligation to apply for bail on Williams' behalf.  However, Petrovich merely states that a defendant, not his attorney, retains the "'ultimate authority to make certain fundamental decisions regarding the case, as to whether to . . . take an appeal.'"  Id. at 963 (quoting Barnes, 463 U.S. at 751).  The case does nothing to undermine the principle that "'[a]n attorney is not required to make a motion on every conceivable ground to provide effective assistance.  It is enough for counsel to have considered the probable success of such motion.'"  Soltero v. Kuhlman, No. 99 Civ. 10765 (GEL), 2000 WL 1781657, at *5 n.7 (S.D.N.Y. Dec. 4, 2000) (quoting Martuzas v. Reynolds, 983 F. Supp. 87, 92 (N.D.N.Y. 1997).  Considering the weakness of Williams' appeal and his extensive criminal history, which includes a prior conviction for bail jumping, it is highly unlikely that any judge would have released Williams on bail.  It cannot be said, therefore, that counsel was ineffective for electing not to pursue such a frivolous application.  See Soltero, 2000 WL 1781657, at *5 n.7 ("Defense counsel's failure to make a bail motion that was either denied or achieved only academic success demonstrates neither ineffectiveness nor prejudice.").

Moreover, because appellate counsel was under no obligation to apply for bail on Williams' behalf, the argument that the "appellate court denied [Williams] counsel by stating that appointed counsel [was] not obligated to make bail applications" also must be rejected.  (See Pet. Attach. at 73, 107).

### d.   Alleged Failure to Correct Errors in the Transcripts

Williams also alleges that his appellate counsel failed to rectify "misquotes, omissions, missing court dates, missing motions and other defects in the transcripts" of the proceedings below.  (Pet. Attach. at 105; see also id. at 9, 74).  Again, appellate counsel need not make every argument pressed upon him by a defendant.  See Barnes, 463 U.S. at 751-54.  The transcripts of the proceedings below do not appear to suffer from any of the defects Williams alleges.  Indeed, they were all certified by the court stenographer present at the proceedings.  Without additional information about what specific "misquotes, omissions, missing court dates, missing motions and other defects" the transcripts supposedly contain, the Court certainly cannot conclude either that appellate counsel was unreasonable in declining to pursue the issue further, or that the outcome of Williams' appeal would have been different had counsel done so.

### e.   Filing Motion in Opposition to Williams' Motion

In December 2005, Williams filed a motion with the Appellate Division requesting that his appellate counsel be relieved, that he be assigned new counsel, and that his two appeals be consolidated.  (Ex. N-1).  Although this motion is not part of the record before the Court, counsel evidently filed an affirmation in opposition to Williams' motion,

in which, according to the Westchester District Attorney's Office, he "aver[red] that defendant [was] requesting new counsel for issues unrelated to the submitted briefs and that following a review of these briefs defendant has been effectively represented on these two appeals."  (Ex. N-2 at 4).  Based on this submission, Williams contends that his "<u>direct appeal counsel</u> had made and submitted a motion <u>against mine</u>[] . . . taking an[] <u>adverse position</u> and <u>disparaging</u> me and my objections by adopting and making <u>false slanderous</u> statements saying that I had '<u>fired</u>' my trial attorney (<u>not true</u>) <u>and mocking</u> my need and deprivation of eyeglasses in violation of . . . <u>Peo[ple] v. Vasquez</u>," 70 N.Y.2d 1 (1987).  (Pet. Attach. 106) (emphasis in original).

       <u>Vasquez</u> requires counsel to (i) make no adverse comment about frivolous claims before the appellate court, and (ii) inform his client that he can raise such issues <u>pro se</u>.  70 N.Y.2d at 4.  This procedure, however, is, at best, a guide to determining what is reasonable; it is not a dispositive rule, the violation of which automatically results in ineffective assistance of counsel.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689 (holding that a "set of rules [for counsel's conduct] would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions").

       Because Mr. Paul's affirmation is not part of the record, the Court has no way of determining whether he in fact made remarks disparaging the merits of Williams' claims.  However, even assuming that he did, this would not require a <u>Rhines</u> stay because it is perfectly clear that Williams cannot show a "reasonable probability" that but for Mr.

Paul's "false slanderous" statements, Williams would have been appointed new counsel —
much less that he would have succeeded in overturning his convictions on appeal.  Indeed,
given the weight of the evidence against Williams, there is no reason to believe that his
appeals could have been prejudiced by anything Mr. Paul said in his affirmation.

> 2.    Other Appeal-Related Issues

Williams also advances several additional unexhausted claims regarding the
appeals process.  He contends that:  (a) he was denied the right to file a supplemental pro
se appellate brief; (b) the misconduct of prison officials prevented him from filing his pro
se brief, as well as other papers, in a timely manner; (c) the trial court wrongly delegated
his CPL § 440 and habeas applications to the Appellate Division; (d) he was denied
transcripts; and (e) he was denied a speedy appeal.  (See Pet. Attach. at 73-75, 103-115).

First, Williams has no constitutional right to submit a pro se brief to
supplement his appointed counsel's brief.  See Edwards v. Mazzuca, No. 00 Civ. 2290
(RJS) (KNF), 2007 WL 2994449, at *14 (S.D.N.Y. Oct. 15, 2007) ("[A] criminal
defendant has no federal constitutional right to represent himself or herself and
simultaneously be represented by counsel.  Such 'hybrid' representation, when it occurs,
occurs at the discretion of the court."); see also United States v. Tutino, 883 F.2d 1125,
1141 (2d Cir. 1989) ("[A] criminal defendant has no constitutional or statutory right to
represent himself as co-counsel with his own attorney.").  Accordingly, anything that may
have inhibited Williams' ability to file a pro se brief does not entitle him to habeas relief.

Williams also alleges that "the trial court had wrongfully delegated [his] CPL 440, habeas corpus [and] bail applications" to the Appellate Division, which "led to their improper review [and] disposition." (Pet. Attach. at 75). There has been no showing that Williams ever filed such applications. (See ECF No. 21 ("Resp't's CompUSA Mem.") at 48-50). In any event, even if he did, Williams has failed to explain what federal constitutional right the state court's "wrongful delegation" would have abridged.

Williams also repeatedly insists that he has been denied access to transcripts of the proceedings on August 13, 2003 and January 6, 2004. (See, e.g., Pet. Attach. at 133). The District Attorney's Office has represented, however, that the minutes of those proceedings were never transcribed. (See Resp't's CompUSA Mem. at 18-22). Even if those transcripts should have been ordered or turned over to the defense, Williams has not shown that he suffered any actual prejudice. Indeed, the proceedings on those days are well-documented and do not support Williams' request for habeas relief. (Id.)

To the extent that Williams alleges a violation of his right to a speedy appeal, his claim is not cognizable in a habeas petition unless he can also show a "reasonable probability that, but for the delay, the result of the appeal would have been different." Mathis v. Hood, 937 F.2d 790, 794 (2d Cir. 1991); see also Muwwakkil v. Hoke, 968 F.2d 284, 285 (2d Cir. 1992) (petitioner is not entitled to release from custody, even if his due process rights have been violated through appellate delay, absent a showing of prejudice).

Here, Williams can show neither unreasonable delay nor prejudice. The Appellate Division decided his appeals in March of 2007 — slightly more than three years after his first conviction and almost exactly three years after his second conviction. (See Ex. S; Ex2. S). In the interim, the Appellate Division appointed appellate counsel for Williams in both cases on June 28, 2004. (Ex. J). Thereafter, on July 10, 2005, Williams' assigned counsel filed briefs in both appeals. (Id.). Williams himself caused much of the remaining delay by the filing of his motion to submit a supplemental pro se brief and the sequelae thereto. After his final motion to reargue the decision vacating his leave to file a supplemental brief was denied in December of 2006, the Appellate Division issued its decision denying his appeal on the merits within three months.

### 3.   Incompetence to Stand Trial

Williams also asserts that he was not competent to stand trial in the CompUSA case due to the injuries that he sustained in April 2002, the medication that he was taking as a result of those injuries, a recent surgery to remove a tumor, and a bronchial infection:

> Throughout the trial I was very sick, injured, overmedicated and incomprehensive, due to injuries & ailments . . . Justice Smith had noted on the record my severe injuries & illnesses that I had suffered through trial (not fit to proceed) after trial Justice Smith had mentioned it on record . . . [d]octors, from various hospitals & centers . . . had strongly advised and ordered me to bed rest, but the court threaten to revoke bail if I did not appear in court.

(Pet. Attach. at 63).

The Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." Cooper v. Oklahoma, 517 U.S. 348, 354 (1996) (quotation marks omitted).  Indeed, "the right not to stand trial while incompetent is sufficiently important to merit protection even if the defendant has failed to make a timely request for a competency determination." Id. at 354 n.4. However, "before being required to hold a competency hearing on its own initiative, the trial judge must be made aware of the factual basis for questioning the competence of the defendant." Nicks v. United States, 955 F.2d 161, 168 (2d Cir. 1992).  In addition, a trial court's determination of competency has generally been considered to be a finding of fact entitled to deference upon habeas review.  See Francis S. v. Stone, 221 F.3d 100, 114-15 (2000). Thus, when reviewing the trial court's decision not to order a competency hearing, this Court must presume the state court's findings of fact are correct in the absence of clear and convincing evidence to the contrary.  Harris v. Kuhlmann, 346 F.3d 330, 350 (2d Cir. 2003).

Despite Williams' contentions that Justice Smith commented upon his injuries and mental state, there simply is no evidence in the trial transcripts to suggest that Williams was unfit to stand trial.  In fact, he appears to have participated fully and actively both in the trial and in the pretrial hearings.  This claim therefore would have to be denied even if it were properly exhausted.

    4.    <u>Access to Holmes</u>

Williams contends that he requested, but was denied, access to co-defendant Holmes in the Staples case.  (<u>See</u> Pet. Attach. at 72).  Construed broadly, Williams' claim is apparently that the State deprived him of his right to present a defense.  Williams makes no showing, however, that Holmes would have testified for him or that his testimony would have raised some reasonable doubt about Williams' guilt.  <u>See</u> <u>Rosario v. Att'y Gen. of N.Y.</u>, No. 00 Civ. 6681 (LAK) (AJP) 2001 WL 267641, at *12 (S.D.N.Y. Mar. 19, 2001); <u>Kuhlmann</u>, 839 F.2d at 925.  In any event, the State plainly could not have "denied" Williams access to Holmes since Holmes absconded before trial and was not found until late 2005.  (<u>See</u> Resp't's Staples Mem. at 61-62). In these circumstances, Williams' right to present a defense was not infringed.[20]

    5.    *<u>Brady</u> Violation*

Relatedly, Williams alleges that he was denied exculpatory evidence, in the form of statements made by his co-defendants, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.  (<u>See</u> Pet. Attach. at 124; Ex2. N-2).

To establish a <u>Brady</u> violation, a petitioner must demonstrate "a reasonable probability that, had the evidence been disclosed to the defense, the result of the

---

[20]    It is possible that Williams has confused his request to interview Holmes with a request he made with respect to Michael Elie, his other co-defendant in the Staples case.  If so, the claim is no more meritorious since the People timely provided Williams' counsel with the name and telephone number of Elie's attorney.  (T2. 439-40).

proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682

(1985).  A petitioner thus must show that:  (a) the evidence was favorable to the accused,

either because it was exculpatory or impeaching; (b) the evidence was suppressed, either

willfully or inadvertently, by the prosecution; and (c) the omission caused prejudice.

<u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  A nondisclosure is prejudicial when

there is a reasonable probability that the outcome of the trial would have been different

had the evidence not been suppressed.  <u>Id.</u> at 281.

 Williams' conclusory allegation that he was deprived of unspecified

exculpatory statements made by his co-defendants falls far short of establishing any of the

three required elements of a <u>Brady</u> claim.

   6. <u>Denial of Right to Testify in the CompUSA Case</u>

 Williams' final claim of constitutional error involves the alleged denial of

his right to testify in his own defense at the CompUSA trial.  Williams alleges that "[d]ue

to inter alia[], my injuries & illnesses (e.g. lost voice; over med[icated]); the prejudicial

newspaper, et al. media reports of me in connection with the courthouse break[-]in; . . . the

prior conviction ruling . . . and also the [police] assault and threats . . . , I was moved &

chose not to take the stand in my own behalf."  (Pet. Attach. at 64).  All but one of these

bases for Williams' claim is not attributable to the State.  It follows that, whatever their

effect may have been on his decision not to testify, they can not give rise to a

constitutional violation.  <u>See</u> <u>Daniel v. Safir</u>, 135 F. Supp. 2d 367, 373 (E.D.N.Y. 2003)

("It is fundamental that state action is a required element of a claim for a constitutional

violation.") (citing <u>Shelley v. Kraemer</u>, 334 U.S. 1, 13 (1948)).  Additionally, Williams'

claim that the police assaulted him finds no support in the record and, therefore, cannot

justify a grant of habeas relief.

IV.    <u>Conclusion</u>

For the foregoing reasons, Williams' two petitions should be denied.

Furthermore, because Williams has failed to make a substantial showing of the denial of a

constitutional right, he should be denied a certificate of appealability.  <u>See</u> 28 U.S.C.

§ 2253(c)(2).

V.    <u>Notice of Procedure for Filing of Objections to this Report and Recommendation</u>

The parties shall have fourteen (14) days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule

72(b) of the Federal Rules of Civil Procedure.  <u>See also</u> Fed. R. Civ. P. 6(a) and (d).  Any

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to

the Chambers of the Honorable William H. Pauley, III and to my Chambers at the United

States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing

parties.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

Any requests for an extension of time for filing objections must be directed to Judge

Pauley.  The failure to file these timely objections will result in a waiver of those

objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992).

Dated:      New York, New York
            October 31, 2011

_____
FRANK MAAS
United States Magistrate Judge

Copies to:

Jomo Williams
3333 Broadway
Apt. D10G
New York, New York 10031

John J. Sergi
Assistant District Attorney
Westchester County District Attorney's Office
111 Dr. Martin Luther King, Jr. Blvd.
White Plains, New York 10601